

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-25-00157-CR

———————————————

NATHANIEL MITCHELL, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 432nd District Court
Tarrant County, Texas
Trial Court No. 1564835

Before Birdwell, Womack, and Walker, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

A jury found Nathaniel Mitchell guilty of one count of felony murder involving the death of Donna Alexander and one count of burglary. *See* Tex. Penal Code §§ 19.02(b)(3), 30.02(c)(2). The jury assessed his punishment at forty-five years' confinement for felony murder and fifteen years' confinement for burglary, and the trial court sentenced him accordingly. In four issues on appeal, Mitchell argues that (1) the two sentences violate his double-jeopardy rights; (2) the evidence is insufficient to support his conviction for felony murder; (3) there is no record of the assignment of the visiting judge who presided over his trial; and (4) the judgments are void because the decision that his sentences would run concurrently was made by the presiding judge who signed the judgments, not the visiting judge who presided over his trial.

We will hold that Mitchell's sentences for both felony murder and burglary violate double jeopardy. Accordingly, we will sustain Mitchell's first issue, and we will reverse the trial court's judgment as to the burglary count and render a judgment of acquittal on that count. We will also hold that the evidence is sufficient to support Mitchell's conviction for felony murder, that he has not preserved his complaint regarding the visiting judge's assignment, and that his complaint that the judgments are void has been rendered moot by our vacating of his burglary conviction and

sentence. We will thus affirm the trial court's judgment as to the felony-murder count.

## II. BACKGROUND

### A. Mitchell's Relationship with Alexander

Mitchell met Alexander in or around 2013. Over the next few years, Mitchell and Alexander began dating "on and off." Mitchell stated that he was never in a monogamous relationship with Alexander. He said that Alexander understood "in the beginning" that he did not want to be monogamous, but he indicated that Alexander wanted to be in a monogamous relationship with him. Mitchell testified that he did not consider Alexander and him to be "a couple," noting that even when they dated each other, they would also get in relationships with other people.

In March 2017, Mitchell began dating a woman named "Kathy." Mitchell said that he and Alexander did not have much communication when he was dating Kathy. Mitchell and Kathy broke up on September 15, 2018. According to Mitchell, after his breakup with Kathy, Alexander told him that he could stay with her until he found a new place to live. Mitchell indicated that he moved his belongings into Alexander's home on the night of September 15, 2018.[1]

_____

[1]There is some dispute regarding whether Mitchell began living with Alexander on September 15, 2018, or whether he just had some belongings at her house. On September 21, 2018, he told a police officer that he and Alexander were living together, although during a later jail call, he said that he was not living with Alexander around the time of her death, maintaining that he just had some clothing at her residence. Alexander's son, who was in the ninth grade at the time of his mother's

3

**B. The Events of September 20–21, 2018**

Derrich Phillips, a long-time friend of Mitchell's,[2] testified that he and Mitchell planned to go to a bar together on the evening of September 20, 2018. Phillips indicated that Alexander dropped Mitchell off at his house around 8:30 p.m. or 9:00 p.m. on September 20. Phillips stated that he and Mitchell took an Uber to the bar and that the plan was for Alexander to pick them up when they were finished. Phillips said that he and Mitchell stayed at the bar until around the time it closed at 2:00 a.m.

Tyisha Bradford, one of Alexander's friends, testified that Alexander called her after Alexander dropped Mitchell off at Phillips's house.[3] Bradford recounted that Alexander was "crying uncontrollably" during the phone call. According to Bradford, Alexander told her that she and Mitchell had "got[ten] into an argument about the phones." Bradford explained that Alexander had given her phone to Mitchell but that Mitchell would not give his phone to Alexander. Bradford stated that Alexander told her that Mitchell had punched her leg and arms during the argument. Bradford said

---

death, testified that he did not remember Mitchell ever being in a relationship with Alexander and that Mitchell had never spent the night at Alexander's home.

[2]Mitchell and Phillips both grew up in Indiana and became friends there. Eventually, both of them made their way to Texas.

[3]Bradford estimated that she received the call around 8:00 or 8:30 p.m.

that she told Alexander during the call that Alexander should call the police and that Alexander had indicated that she was going to "file a protection order the next day."

Jasmine Owens, a friend of Mitchell's who had dated him in the past, stated that in the early morning of September 21, she received a phone call from him asking if she could give him a ride from the bar.[4] Owens agreed, and she picked Mitchell and Phillips up from the bar. Owens testified that after dropping Phillips off at his home, she drove Mitchell to Alexander's house.[5] Owens said that she dropped Mitchell off near Alexander's house and that she then drove away.

Alexander's son, Jaylen, stated that he woke up around 3:00 a.m. or 4:00 a.m. on the morning of September 21 because he heard Mitchell banging on the front door of Alexander's home.[6] Jaylen testified that the front door was not opened for Mitchell. According to Jaylen, around five to ten minutes after he first heard the banging on the front door, he heard glass breaking.[7] Jaylen maintained that around

---

[4]At trial, Mitchell indicated that he had called Owens because Alexander had refused to pick him and Phillips up from the bar.

[5]Owens stated that she did not know Alexander personally but that she knew that Alexander had dated Mitchell and that Alexander and Mitchell were friends.

[6]Jaylen said that he knew that Mitchell was the person banging on the door, indicating that he recognized Mitchell's voice.

[7]Jaylen stated that he was in his bedroom when he heard the banging at the door and the glass breaking.

fifteen to twenty minutes after he heard glass breaking, he heard Alexander's car leaving the garage.

## C. Alexander's Injuries and Death

Sonja Moreno, a registered nurse at Baylor Scott & White Emergency Hospital in Grand Prairie (the Grand Prairie Hospital), stated that Mitchell brought Alexander to the Grand Prairie Hospital around 5:00 a.m. on September 21. Moreno said that Alexander was "noncoherent" and "groaning" when she arrived. Moreno had to use a wheelchair to get Alexander from the vehicle into the facility. Moreno stated that Alexander was "confused," "not really responding," and that she was "slumping over" in the wheelchair. Moreno indicated that Alexander could not tell hospital staff her name, and staff had to obtain Alexander's history from Mitchell because she was "not talking." Mitchell told Moreno that Alexander "fell in the shower and hit the back of her head."

Alexander received a CT scan at the Grand Prairie Hospital. Moreno said that the CT scan revealed "moderate amounts of subarachnoid hemorrhaging on the anterior frontal lobes and also anterior" and "small subdural hematomas along the anterior medial cranial and other small amount of subdural hematomas in other areas," along with a "cranial fracture." Moreno explained that a cranial fracture "is a break in the skull" and that it is "very . . . severe." Moreno testified that Alexander's injuries were not consistent with a slip and fall in the shower. Moreno said that Alexander's injuries were consistent with "some sort of force happening." In

6

Moreno's opinion, Alexander's injuries could not have been caused by somebody pushing her with force but could have been caused by somebody throwing her body to the ground.

Dr. Dillon Paul, an emergency physician at the Grand Prairie Hospital, treated Alexander. Dr. Paul stated that Alexander had "a low level of consciousness" when he first started treating her. Dr. Paul ordered a CT scan, which revealed that Alexander had sustained "very significant trauma." Dr. Paul indicated that the CT scan showed that Alexander had sustained a skull fracture and that there was swelling and bleeding in her brain. He stated that those injuries were an indication of "significant trauma." Dr. Paul testified that he would not expect a ground-level fall to cause bleeding inside the brain, noting that Alexander's injuries were "just not something you would see from [a] ground-level fall."[8]

Around three hours after Alexander arrived at the Grand Prairie Hospital, she was transported by ambulance to Baylor University Medical Center (the Dallas Hospital), a Level I trauma center.[9] Dr. Lauren Fine, an emergency physician at the Dallas Hospital, treated Alexander. Dr. Fine stated that Alexander had sustained a skull fracture and a subdural hemorrhage. Dr. Fine testified that she had been told that Alexander had slipped and fallen in the shower. Dr. Fine maintained that

---

[8]Dr. Paul stated that a slip and fall around a shower is a ground-level fall.

[9]One witness at trial testified that a Level I trauma center is the "highest standard of trauma certification."

7

Alexander's injuries were "[a]bsolutely not consistent" with a slip and fall in the shower. According to Dr. Fine, Alexander's injuries required "some sort of force." She stated that the force could have come from "somebody grabbing her and throwing her to the ground" or from "her striking her head against an unknown object." Dr. Fine said that she had never seen a subdural hematoma in a "young person"[10] that was caused by a ground-level fall.

On September 24, Alexander died from her injuries.

## D. Alexander's Autopsy

Dr. Jill Urban, a forensic pathologist and medical examiner at the Dallas County Medical Examiner's Office, supervised Alexander's autopsy.[11] Dr. Urban noted that the outside of Alexander's head had a laceration that was one and three quarters inches by one and one-half inches. Dr. Urban stated that Alexander's brain had sustained "a great deal of swelling" and that there was bleeding over the brain's surface. Dr. Urban maintained that the swelling and bleeding in Alexander's brain were caused by a "blunt-force injury." As to other injuries, Dr. Urban testified that there was a bruise on the inside of Alexander's right arm and an injury to her right toe that appeared to be sustained around the same time as Alexander's head injury.

---

[10]Dr. Fine stated that she considered "anyone under 60" to be a "younger person."

[11]Dr. Urban stated that she supervised another physician—who she described as a "fellow"—with the performance of Alexander's autopsy.

8

Dr. Urban explained that blunt-force trauma occurs when either a blunt object strikes the body or the body strikes a blunt object. Dr. Urban determined that Alexander died as a result of blunt-force head injuries and that the manner of death was homicide. She also said that "the brain swelling and the brain bruising is what . . . caus[ed] [Alexander's] death."

At trial, Dr. Urban stated, "I think this injury was because [Alexander's] head went backwards and struck something." She further maintained, "I think it's far less likely that she was standing in an upright position and struck with a blunt object," noting that Alexander's "injuries [were] more consistent with . . . being pushed backwards with some speed and striking an object."

Dr. Urban indicated that Alexander also had bruising on the front portions of her brain. Dr. Urban explained that bruising to the front of the brain can occur from an impact to the back of the head because "if a person falls or is pushed backwards and strikes their head . . . , when the back of the skull hits, the brain kind of bounces forward, and the brain will then strike the inside of the skull." Dr. Urban stated that the findings of bruising on the front of Alexander's brain coupled with a "very clear impact site on the back" indicated to her that "this was most likely a case of [Alexander's] body going backwards and the back of her head striking something."

Dr. Urban acknowledged that it was "not impossible" for Alexander's injuries to have been sustained from "a ground-level fall." When asked what she meant by stating that it was "not impossible," Dr. Urban stated that "oftentimes these injuries

9

need kind of an element of acceleration, you know, extra force added to them" and that she had "seen cases where a person has fallen and sustained these kind of impact injuries." Dr. Urban said that "anytime you add an element of force . . . you have a potentially more serious injury." Dr. Urban testified that it was "possible" that Alexander's injuries were caused by a "slip and fall," although she also said that Alexander's injuries could have been caused "by [her] being pushed to the ground with force."

## E. The Police Investigation

Brian Reeves, an officer with the Grand Prairie Police Department, was dispatched to Alexander's home on September 21 to do a child welfare check. As he was walking around the outside of the home, Reeves noticed that a window in the backyard "appeared to have been busted out." Reeves stated that as he looked closer at the window, he observed that there was blood on the window frame. Reeves indicated that the broken window went into Alexander's bedroom. When he went inside the house, Reeves observed blood on the window shades in Alexander's bedroom and on the floor. Reeves also saw towels on the bathroom floor that had blood on them and a "small amount of blood" in the shower.

Jeff Askin, a detective with the Grand Prairie Police Department at the time of Alexander's death, testified that he obtained a warrant to search Alexander's home. After obtaining the search warrant, Askin went to the home, where he observed blood on Alexander's bed, the "door near the bathroom," the bathroom wall, and the

bathroom floor. Askin stated that Mace had been deployed in the bathroom, noting that residue from the Mace was found on the bathroom's mirror, the bathroom's wall, and in the bathtub. Askin later determined that Alexander had purchased Mace on September 20.

Brandon Poor, a detective with the Grand Prairie Police Department who is a certified cell-phone examiner, performed a cell-phone extraction on Alexander's cell phone. That extraction revealed that on September 19, Mitchell texted Alexander a series of messages including the following: "U are stupid"; "Dummy"; "A[**]hole"; "B[*]tch shut up"; "F[*]ck I hate I told u anything about me"; "I'll kick myself out"; "B[*]tch you were made for man . . . go read it"; "Get your stuck up a[**] on"; and "It bothers me cause you're starting sh[*]t and pissing me off." Despite the tenor of those messages, Mitchell texted Alexander several times on September 20 to remind her that he was going to be "hanging" out with Phillips.

At 9:27 p.m. on September 20—a little less than an hour after Alexander dropped him off at Phillips's house—Mitchell texted Alexander, "I'm sorry." At 11:28 p.m., Alexander texted Mitchell, "Please don't go to the house. [I] will send your things for work to [you] tonight." Over the following twenty-odd minutes, Mitchell texted Alexander a series of messages, including: "Wtf"; "How the hell [am] I going to get back"; "Or where to go"; "Are yo[u] trying to make me lose the job I just got"; "Omfg"; "There's no limit for yo[u]"; "I have no[]where to go"; "I don't have money to Uber back there"; "Wtf[,] I'm not go[ing] to touch you"; "But [yo]u

11

can take the chance of causing my anger"; "You are not about to leave me stranded and put my f[*]cking friend in this"; "Tf let me get my sh[*]t and I'm gone out of your life forever"; and "Just come get me."

At 11:51 p.m., Alexander texted Mitchell, "You will not step foot in my home or anywhere close to my kids." Mitchell responded with a series of messages imploring Alexander to come and pick him up. At 12:06 a.m. on September 21, Alexander texted Mitchell, "You won't get the chance to kill me." Mitchell continued texting Alexander over the next few hours, telling her that she was ruining his life and complaining of being stranded. At 3:19 a.m., Mitchell texted Alexander, "Open door." At 3:25 a.m., Alexander wrote back, "[Yo]u [are] scaring my kids."[12]

Amanda Page, a crime scene investigator for the Grand Prairie Police Department at the time of Alexander's death, went to Alexander's home after the search warrant was issued. Page observed male clothing near the window in Alexander's room that appeared to have blood on it. She also described using luminescence to reveal blood in Alexander's bathroom, including blood in the shower, in the bathtub, on the bathroom floor, and in the shower seat. Page discovered a Mace canister on a table toward the foot of the bed in Alexander's bedroom. Page also said that a Mace canister was found in Alexander's purse.

---

[12]The cell-phone extraction also revealed that between 3:12 a.m. and 3:25 a.m. on September 21, Mitchell made twenty-two unanswered phone calls to Alexander's cell phone.

## F. Mitchell's Varying Accounts

Amber Jefferson, a patrol officer with the Grand Prairie Police Department at the time of the incident, spoke with Mitchell at the Dallas Hospital on September 21.[13] Mitchell told Jefferson that he and Alexander had showered; that he had gotten out of the shower first; that when Alexander later got out of the shower, she "slipped and fell"; that he did not see the fall but that he heard the fall; that after the fall, he laid Alexander down on the bed for a couple of minutes; that she then threw up; and that he subsequently got Alexander dressed and drove her to the hospital. While she was speaking with Mitchell, Jefferson observed that he had a "two-inch scrape" on his right shin. Mitchell denied that he and Alexander had been "arguing" or "fighting."

Mitchell also exchanged text messages with Phillips on the morning of September 21. At 7:24 a.m., Phillips texted Mitchell, "Fun time bro. Thanks." Twenty minutes later, Mitchell texted back: "Definitely." At 10:12 a.m., Mitchell texted Phillips, "Might be going to jail. Me and [Alexander] got into it last night[;] she wouldn't let me in. Finally got in[,] and she was chasing me and fell and bumped [her] head. I brought her to [the] hospital[,] and now the police are detaining me for assault[.] Just a heads up[.]"

---

[13]A video from Jefferson's body camera depicting the conversation was admitted into evidence at Mitchell's trial.

13

In a jail call to a relative, Mitchell stated that Alexander had been drinking and had "lost her damn mind." During that call, Mitchell maintained that he did not do anything to Alexander, although he said he "should have." He stated during that call that Alexander had just slipped and fallen. During a different jail call, Mitchell said that Alexander had Maced him, that he did not touch her, and that she had just slipped. In another call, Mitchell indicated that he came into Alexander's home, she Maced him, he got mad, and he pushed her out of the way. During yet another call, Mitchell said that the incident was "an accident." In that same call, Mitchell claimed that he did not break the window at Alexander's home.

At trial, Mitchell stated that he and Alexander had left for Phillips's house around 7:30 p.m. and had arrived around 8:15 p.m. He recounted that during the drive, he and Alexander had gotten into an argument about "photos and things that she found in [his] cell phone." Mitchell said that they both raised their voices at one another, although he said the conversation was "not very heated." Despite claiming that the conversation was "not very heated," Mitchell stated that Alexander had hit him during the drive and that he had slapped her hands and arms in response. Mitchell denied assaulting Alexander.

Mitchell testified that when he arrived at Alexander's home, his plan was to get his belongings and leave. He admitted that he was "a little upset" that Alexander did not pick him up from the bar. Mitchell said that Alexander refused to open the door for him, so he sat on the ground for around thirty minutes and remained outside for

14

around an hour. He stated that Alexander then called him, and that after she did that, he "started to try around the back of the home." He recounted that he went to the backyard, got in front of the window of Alexander's bedroom, and started "bamming on the window." Mitchell admitted that he broke the window using his hand, although he claimed that he did not hit the window very hard and that he did not intentionally break it. Mitchell stated that he cut his arm while breaking the window. Mitchell said that after the window broke, he "took the opportunity and . . . entered the home."

Mitchell said that after crawling through the window, he changed his clothes because he had gotten blood on them from his cut. Mitchell maintained that he and Alexander were arguing while he was changing clothes and that after changing, he headed to the closet in the bathroom to get his belongings. Mitchell stated that Alexander made a comment while he was walking toward the closet, and he said something "horrible" in return. According to Mitchell, Alexander then sprayed him "[d]irectly in the face" with Mace while he was standing in the doorway of the bathroom closet.

Mitchell said that after he was sprayed with Mace, he fell into the bathtub. According to Mitchell's testimony, after he fell into the bathtub, he "turned around," started "swinging his arms," and "bumped" Alexander. Mitchell claimed that he did not see Alexander fall but that he heard her fall, describing how he heard a "vanity chair" that was in the bathroom hit a wall "really hard" when Alexander fell. Mitchell

15

said that he heard Alexander "screaming and cursing" on the ground after the alleged fall. Mitchell testified that he then made his way to the bathroom sink, where he "threw water" on his face; afterward, he walked toward the bed, tripping over Alexander in route.

Mitchell stated that he then sat on the bed "for a second," and after hearing Alexander "screaming" about her "head," Mitchell picked her up and put her on the bed to try to assess the situation. Mitchell claimed that because he could not see any cut on Alexander's head, he moved her to the shower to better ascertain her injury. Mitchell testified that he was unable to see Alexander's wound in the shower, so he brought her back to the bed where he sprayed her with hydrogen peroxide. Mitchell claimed that he then put a dry shirt on Alexander, carried her to the garage, put her in her vehicle, and drove her to the Grand Prairie Hospital.[14]

At trial, Mitchell admitted that he had not been truthful to police. Mitchell acknowledged that he had given differing "variations" of the account to police and medical personnel, stating that he had done so because he "just didn't want to give the full story to anyone."

---

[14]Mitchell claimed to have driven Alexander to the Grand Prairie Hospital around ten to fifteen minutes after he was Maced.

16

## G. Procedural Background

Mitchell's trial took place over six days in May 2025. The Honorable David Hagerman presided over Mitchell's trial. Numerous witnesses testified at trial.[15] The jury ultimately found Mitchell guilty of felony murder and burglary. It assessed his punishment at forty-five years' confinement for felony murder and fifteen years' confinement for burglary, and it assessed a $5,000 fine on both counts. Judge Hagerman sentenced Mitchell accordingly. Following sentencing, the Honorable George Gallagher signed the judgments of conviction. This appeal followed.

## III. DISCUSSION

## A. Mitchell's Double-Jeopardy Complaint

In his first issue, Mitchell argues that his sentences for both felony murder and burglary violate his double-jeopardy rights. The State agrees.[16]

### 1. Applicable Law

The Double Jeopardy Clause of the Fifth Amendment protects a defendant from multiple punishments for the same offense. U.S. Const. amend. V; *Brown v.*

---

[15]The pertinent testimony from the witnesses is recounted above in our discussion of the facts.

[16]While the State's confession of error in a criminal case carries great weight, it is not binding. *Saldano v. State*, 70 S.W.3d 873, 884 (Tex. Crim. App. 2002); *Arent v. State*, No. 02-20-00023-CR, 2020 WL 6326151, at *1 n.1 (Tex. App.—Fort Worth Oct. 29, 2020, no pet.) (mem. op., not designated for publication). Thus, "[e]ven when the State makes concessions, we must independently examine the record because the proper administration of criminal law cannot be left to the parties' stipulations." *Arent*, 2020 WL 6326151, at *1 n.1; *see Saldano*, 70 S.W.3d at 884.

17

*Ohio*, 432 U.S. 161, 165, 97 S. Ct. 2221, 2225 (1977); *Ex parte Adams*, 586 S.W.3d 1, 4 (Tex. Crim. App. 2019). A multiple-punishments double-jeopardy violation may occur in several different contexts. *Whatley v. State*, No. 02-24-00203-CR, 2025 WL 1085192, at *5 (Tex. App.—Fort Worth Apr. 10, 2025, no pet.) (mem. op., not designated for publication) (citing *Littrell v. State*, 271 S.W.3d 273, 275–76 (Tex. Crim. App. 2008)). As relevant here, "a multiple[-]punishments double-jeopardy violation occurs if both a greater and a lesser-included offense are alleged and the same conduct is punished once for the greater offense and a second time for [the] lesser." *Ex parte Denton*, 399 S.W.3d 540, 545 (Tex. Crim. App. 2013); *see Blakeway v. State*, No. 08-23-00280-CR, 2024 WL 3997837, at *5 (Tex. App.—El Paso Aug. 29, 2024, no pet.) (mem. op., not designated for publication).

"An offense is a lesser[-]included offense if . . . it is established by proof of the same or less than all the facts required to establish the commission of the offense charged." *Lang v. State*, 664 S.W.3d 155, 164 (Tex. Crim. App. 2022) (citing Tex. Code Crim. Proc. art. 37.09(1)). "Rephrased, a lesser-included offense exists if proof of the alleged offense would also prove the supposed lesser-included offense." *Id.* Whether a lesser-included offense exists is a question of law, and determining the question does not depend on the evidence produced at trial. *Id.*; *Safian v. State*, 543 S.W.3d 216, 220 (Tex. Crim. App. 2018).

To determine whether a defendant has been assessed multiple punishments for the same offense, we start with the "same elements" test established in *Blockburger*.

18

*Bien v. State*, 550 S.W.3d 180, 184 (Tex. Crim. App. 2018) (referring to *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932)). Under the *Blockburger* test, two offenses are not the same if "each provision requires proof of a fact [that] the other does not." *Id.* (quoting *Blockburger*, 284 U.S. at 304, 52 S. Ct. at 182).

But in Texas, the analysis does not end there. *McBath v. State*, No. 02-23-00056-CR, 2024 WL 853351, at *5 (Tex. App.—Fort Worth Feb. 29, 2024, no pet.) (mem. op., not designated for publication). "Using the cognate-pleadings approach, we also look to the pleadings to flesh out the *Blockburger* test." *Id.* (citing *Bien*, 550 S.W.3d at 184); *see Lang*, 664 S.W.3d at 164 ("To determine whether a lesser-included offense exists under [A]rticle 37.09(1), the Court uses the cognate-pleadings approach.").

Under the cognate-pleadings approach, even if the offenses have differing elements under *Blockburger*, they may still be the same for double-jeopardy purposes if the indictment alleges the same facts required. *Bigon v. State*, 252 S.W.3d 360, 370 (Tex. Crim. App. 2008); *McBath*, 2024 WL 853351, at *5. After applying the cognate-pleadings approach, if the two offenses have the same elements, a judicial presumption arises that the offenses are the same for double-jeopardy purposes, and the defendant may not be convicted of both offenses. *Bien*, 550 S.W.3d at 184; *McBath*, 2024 WL 853351, at *5. Conversely, if the two offenses, as pleaded, have different elements, there is a judicial presumption that the offenses are different for double-jeopardy purposes, and multiple punishments may be imposed. *Bien*, 550 S.W.3d at 184–85; *McBath*, 2024 WL 853351, at *5.

19

When a defendant fails to raise his double-jeopardy complaint in the trial court, he may raise it for the first time on appeal "when the undisputed facts show the double[-]jeopardy violation is clearly apparent on the face of the record and when enforcement of [the] usual rules of procedural default serves no legitimate state interests." *Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex. Crim. App. 2000); *see McBath*, 2024 WL 853351, at *5.

### 2. Analysis

In their respective briefs, both parties point us to the opinion of the Court of Criminal Appeals in *Littrell*. *See* 271 S.W.3d at 276–79. We find that case instructive. In *Littrell*, the appellant was charged with felony murder based on the theory that he had committed an act clearly dangerous to human life that caused the complainant's death during the commission of aggravated robbery. *Id.* at 276. The appellant was also charged with aggravated robbery. *Id.* The Court of Criminal Appeals noted that "[i]n order to establish felony murder as alleged in Count One, the State need[ed to] prove no more than the aggravated robbery . . . alleged in Count Two, plus additional facts." *Id.* at 276–77. Further, the court found that "[i]n order to prove the aggravated robbery, the State need[ed to] prove no additional fact that [was] not already contained in Count One." *Id.* at 277. Thus, the court held that the aggravated-robbery count was "clearly subsumed within, and therefore . . . a lesser-included offense" of the felony-murder count. *Id.* The court went on to state that in the absence of any clear expression of contrary legislative intent, "the offense of

20

aggravated robbery as pled in Count Two of the appellant's indictment was a lesser-included offense of, and therefore the same offense for double-jeopardy purposes as, the offense of felony murder as specifically pled in Count One." *Id.* at 279.

Similar to the circumstances in *Littrell*, here, Mitchell was charged with both felony murder and burglary. *See id.* As relevant to Mitchell's first issue, the indictment stated,

> And it is further presented in and to said court that on or about the 21st day of September 2018, in the County of Tarrant and the State of Texas, [Mitchell did then and there] commit or attempt to commit an act clearly dangerous to human life, namely, push or shove Donna Alexander with defendant's hand or arm or push or shove Donna Alexander with defendant's hand or arm causing her to hit an unknown object, which caused the death of Donna Alexander, and the said defendant was in the course of or immediate flight from the commission or attempted commission of a felony, namely: burglary.
>
> . . . .
>
> And it is further presented in and to said court that the defendant in the County of Tarrant and State aforesaid on or about the 21st day of September 2018, did intentionally or knowingly, without the effective consent of Donna Alexander, the owner thereof, enter a habitation or a part thereof with intent to commit assault.

The court's charge asked the jury whether Mitchell had committed felony murder. The relevant portion of the charge stated,

> Now, if you find from the evidence beyond a reasonable doubt that on or about the 21st day of September 2018, in Tarrant County, [S]tate of Texas, the defendant . . . did then and there commit or attempt to commit an act clearly dangerous to human life, namely push or shove Donna Alexander with defendant's hand or arm causing her to hit an unknown object, which caused the death of Donna Alexander, and the said defendant was in the course of or immediate flight from the

21

commission or attempted commission of a felony, namely burglary, then you will find the Defendant guilty of Felony Murder.

The charge also asked the jury whether Mitchell had committed burglary. The relevant portion of the charge said,

Now, if you find from the evidence beyond a reasonable doubt that on or about the 21st day of September 2018, in Tarrant County, [S]tate of Texas, the defendant . . . did intentionally or knowingly, without the effective consent of Donna Alexander, the owner thereof, enter a habitation or a part thereof with intent to commit assault, or did intentionally or knowingly, without the effective consent of Donna Alexander, the owner thereof, enter a habitation or a part thereof and did commit or did attempt to commit assault, then you will find the Defendant guilty of burglary of a habitation.

The jury ultimately convicted Mitchell of both felony murder and burglary.

As pleaded, to establish a conviction for felony murder, the State needed to prove no more than burglary plus additional facts. *See id.* at 276. But, to prove burglary, the State needed to prove no additional fact that was not already contained in the felony-murder count. *See id.* Thus, the burglary count was "clearly subsumed within, and therefore . . . a lesser-included offense" of the felony-murder count. *Id.* at 277. And having found no clear expression of contrary legislative intent, we hold that the burglary offense as pleaded in the State's indictment was a lesser-included offense of, and therefore the same offense for double-jeopardy purposes as, the offense of felony murder as pleaded in the State's indictment *See id.* at 279. Accordingly, we hold that Mitchell's convictions and punishments for both counts violate his double-jeopardy right against multiple punishments. *See Bien*, 550 S.W.3d at 184; *Littrell*,

22

271 S.W.3d at 276; *McBath*, 2024 WL 853351, at *5; *see also Magana v. State*, 351 S.W.3d 501, 505–06 (Tex. App.—San Antonio 2011, pet. ref'd) (holding that appellant's conviction for robbery violated the Double Jeopardy Clause because it was a lesser-included offense of felony murder for which he was also convicted).

And although Mitchell did not raise this complaint in the trial court, because error is clearly apparent on the face of the record and enforcing the usual rules of procedural default would serve no legitimate state interest,[17] we hold that he may raise it for the first time on appeal. *See Gonzalez*, 8 S.W.3d at 643; *McBath*, 2024 WL 853351, at *5.

When we find a double-jeopardy violation due to multiple punishments, the remedy is to retain the most serious offense and to vacate the other. *Littrell*, 271 S.W.3d at 279 n.34. Generally, the "most serious offense" is the offense of conviction for which the "greatest sentence was assessed." *Bien*, 550 S.W.3d at 188; *Birdo v. State*, No. 02-22-00142-CR, 2023 WL 4630627, at *5 (Tex. App.—Fort Worth July 20, 2023, pet. ref'd) (mem. op., not designated for publication). Here, the jury assessed the greater sentence for the felony-murder offense. We thus conclude that

---

[17]Indeed, the State agrees that Mitchell's double-jeopardy rights have been violated, and it asks us to reform the trial court's judgments to delete his burglary conviction and sentence. *See also Walker v. State*, No. 02-23-00346-CR, 2024 WL 3715011, at *5 (Tex. App.—Fort Worth Aug. 8, 2024, no pet.) (mem. op., not designated for publication) ("While the State may have an interest in maintaining a conviction's finality, there is no legitimate interest in maintaining a conviction when the face of the record clearly shows that the conviction was obtained in contravention of constitutional Double Jeopardy protections.").

Mitchell's conviction and sentence for felony murder should be retained and his conviction and sentence for burglary should be vacated. *See Bien*, 550 S.W.3d at 188; *Littrell*, 271 S.W.3d at 279 n.34.

Accordingly, we reverse the trial court's judgment as to the burglary count and render a judgment of acquittal on that count. *See Carter v. State*, No. 02-23-00306-CR, 2024 WL 3364825, at *3 (Tex. App.—Fort Worth July 11, 2024, no pet.) (mem. op., not designated for publication) (reversing judgment as to one count and rendering judgment of acquittal on that count due to double-jeopardy violation but affirming judgment as to another count); *Barnes v. State*, 665 S.W.3d 192, 203 (Tex. App.—Eastland 2023, no pet.) ("We vacate Appellant's felony[-]murder conviction because it violates the Double Jeopardy Clause. Accordingly, we reverse the judgment of the trial court as to [that count] and render a judgment of acquittal as to that count."); *Cappiello v. State*, No. 02-19-00197-CR, 2022 WL 1420763, at *10 (Tex. App.—Fort Worth May 5, 2022, pet. ref'd) (mem. op., not designated for publication) ("Having determined that Cappiello's second theft conviction violates the Double Jeopardy Clause by imposing multiple punishments for the same offense, we reverse the trial court's judgment as to that count . . . , and we render a judgment of acquittal on that count.").

We sustain Mitchell's first issue.

24

## B. Mitchell's Sufficiency Complaint

In his second issue, Mitchell argues that the evidence is insufficient to support his conviction for felony murder.

### 1. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the

evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Hammack*, 622 S.W.3d at 914. The law as authorized by the indictment means the statutory elements of the offense as modified by the charging instrument's allegations. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021); *see Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Carter v. State*, 620 S.W.3d 147, 149 (Tex. Crim. App. 2021).

26

## 2. Applicable Law

A variance occurs when there is a discrepancy between the allegations in the State's charging instrument and the proof at trial. *Gollihar v. State*, 46 S.W.3d 243, 246 (Tex. Crim. App. 2001); *Churkey v. State*, No. 02-23-00021-CR, 2023 WL 8643019, at *5 (Tex. App.—Fort Worth Dec. 14, 2023, no pet.) (mem. op., not designated for publication). When a variance occurs, the State has proven the defendant guilty of a crime but has proven its commission in a manner that varies from the allegations in the charging instrument. *Gollihar*, 46 S.W.3d at 246; *Churkey*, 2023 WL 8643019, at *5. There are two types of variances in an evidentiary-sufficiency analysis—material variances and immaterial variances. *Thomas v. State*, 444 S.W.3d 4, 9 (Tex. Crim. App. 2014); *Churkey*, 2023 WL 8643019, at *5. An immaterial variance does not affect the validity of a criminal conviction; thus, a hypothetically correct jury charge need not incorporate allegations that would give rise to only immaterial variances. *Thomas*, 444 S.W.3d at 9; *Churkey*, 2023 WL 8643019, at *5. But a material variance renders a conviction infirm, and the only remedy for a material variance is to render an acquittal. *Thomas*, 444 S.W.3d at 9; *Churkey*, 2023 WL 8643019, at *5.

A variance is material only when it prejudices the defendant's substantial rights. *Gollihar*, 46 S.W.3d at 257; *Churkey*, 2023 WL 8643019, at *5. A defendant's substantial rights are not prejudiced as long as the indictment, as written, informed the defendant of the charge against him sufficiently to allow him to prepare an adequate defense at trial and as long as the deficiently drafted indictment would not subject the

27

defendant to the risk of being prosecuted later for the same crime. *Gollihar*, 46 S.W.3d at 257; *Churkey*, 2023 WL 8643019, at *5.

### 3. Analysis

In his brief, Mitchell argues that "[t]he evidence is insufficient because [it] shows that whoever killed Alexander did it not by a push or shove but by slamming her head into a hard object." Mitchell contends that there is a variance between the allegations in the indictment—that he pushed or shoved Alexander with his hand or arm causing her to hit an unknown object—and the evidence at trial—that he claims shows that Alexander's head was "slammed" into a hard object. Mitchell maintains that this variance is material. We disagree with Mitchell's contentions.

As a preliminary matter, we note that Mitchell has not demonstrated that he was surprised or prejudiced by any alleged variance between the State's allegations and the evidence at trial. Absent such a showing, we cannot say that the alleged variance was material. *See Santana v. State*, 59 S.W.3d 187, 194 (Tex. Crim. App. 2001) ("In variance law, it is well-settled that the burden of demonstrating surprise or prejudice rests with the defendant."); *Cole v. State*, 611 S.W.2d 79, 82 (Tex. Crim. App. 1981) ("Despite appellant's general contention that the variance misled him and prejudiced the preparation of his defense, we are unable to say that he has shown such surprise or prejudice as to make it a fatal variance."); *Baker v. State*, No. 06-05-00091-CR, 2006 WL 2418868, at *3 (Tex. App.—Texarkana Aug. 23, 2006, no pet.) (mem. op., not designated for publication) ("Baker's contention . . . is simply that there is a variance;

28

he makes no claim or showing of how the alleged variance prejudiced him. Because Baker has failed to show his substantial rights were prejudiced, the variance, if any, is immaterial." (footnote omitted)).

In any event, we do not think that there was any variance—let alone a material variance—between the allegations in the State's charging instrument and the proof at trial. As noted above, the State's indictment alleged that Mitchell pushed or shoved Alexander with his hand or arm or that he pushed or shoved her with his hand or arm causing her to hit an unknown object. Credible evidence at trial supports a conviction under the State's indictment. That evidence includes:

- Dr. Urban's testimony that the swelling and bleeding in Alexander's brain were caused by a "blunt-force injury";

- Dr. Urban's testimony that "the brain swelling and the brain bruising is what . . . caus[ed] [Alexander's] death";

- Dr. Urban's determination that Alexander died as a result of blunt-force head injuries and that the manner of death was homicide;

- Dr. Urban's statement that Alexander's injury was caused by her head going backwards and striking something;

- Dr. Urban's testimony that Alexander's "injuries [were] more consistent with . . . being pushed backwards with some speed and striking an object";

- Dr. Urban's explanation for the bruising on the front portions of Alexander's brain as being caused by Alexander's "body going backwards and the back of her head striking something";

- Dr. Urban's statement that Alexander's injuries could have been caused "by [her] being pushed to the ground with force";

29

- Dr. Fine's testimony that Alexander's injuries could have been caused by "somebody grabbing her and throwing her to the ground" or from her "striking her head against an unknown object"; and

- Mitchell's statement in a jail call indicating that after he came into Alexander's home, she Maced him, he got mad, and he pushed her out of the way.

After viewing all the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that Mitchell caused Alexander's death with a push or a shove. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789. Even if we might have found to the contrary were we sitting as the factfinder, we cannot act as the "thirteenth juror," and we may not substitute our judgment for that of the jury. *See Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014) (stating that a reviewing court should not act as a "thirteenth juror"); *Burgess v. State*, No. 02-19-00203-CR, 2021 WL 3556953, at *3 n.6 (Tex. App.—Fort Worth Aug. 12, 2021, no pet.) (mem. op., not designated for publication) ("[T]he factfinder alone—in this case, the jury—judges the evidence's credibility, and we may not act as a thirteenth juror, re-evaluating the weight and credibility of the evidence and, thus, substituting our judgment for that of the factfinder.").

We overrule Mitchell's second issue.

**C. Mitchell's Complaint That the Record Does Not Contain an Order of Assignment of the Visiting Judge Who Presided Over His Trial**

In his third issue, Mitchell complains that there is no record of the assignment of the visiting judge who presided over his trial. He claims that, without an order of assignment, there can be no evaluation of whether the visiting judge had the authority to preside over the case. Mitchell acknowledges that he did not raise this objection in the trial court.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion sufficiently stating the specific grounds, if not apparent from the context, for the desired ruling. Tex. R. App. P. 33.1(a)(1); *Montelongo v. State*, 623 S.W.3d 819, 822 (Tex. Crim. App. 2021). Further, the party must obtain an express or implicit adverse trial-court ruling or object to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2); *Dixon v. State*, 595 S.W.3d 216, 223 (Tex. Crim. App. 2020). These preservation rules apply to complaints regarding the authority of a visiting judge to preside over a trial. *See Wilson v. State*, 977 S.W.2d 379, 380–81 (Tex. Crim. App. 1998) (holding that appellant forfeited his right to challenge the authority of the judge who presided over his trial when he never raised the complaint in the trial court); *Smith v. State*, No. 09-11-00606-CR, 2013 WL 4774054, at *3 (Tex. App.—Beaumont Sept. 4, 2013, no pet.) (mem. op., not designated for publication) ("The record shows that Smith knew that the visiting judge would be presiding over his case and that he did not object that an order memorializing the

31

assignment did not appear of record when the trial commenced. We hold that by failing to object before trial commenced about the procedural irregularity concerning the date of the visiting judge's appointment, Smith failed to preserve his complaint for our review on appeal.").

In his brief, Mitchell candidly acknowledges that "precedent is against him" regarding this complaint.[18] We agree, and we hold that Mitchell has failed to preserve this issue by not raising it in the trial court. *See* Tex. R. App. P. 33.1(a)(1); *Wilson*, 977 S.W.2d at 380–81; *Smith*, 2013 WL 4774054, at *3; *see also Lackey v. State*, 364 S.W.3d 837, 846 (Tex. Crim. App. 2012) ("[A]n objection to the authority of the individual purporting to conduct a proceeding must be timed so as to 'afford both the trial judge and the State notice of the procedural irregularity and an adequate opportunity to take appropriate corrective action.'" (quoting *Wilson*, 977 S.W.2d at 380–81)); *Quinnones v. State*, No. 04-99-00595-CR, 2001 WL 38127, at *8 (Tex. App.— San Antonio Jan. 17, 2001, pet. ref'd) (not designated for publication) ("A procedural irregularity in the assignment of an otherwise qualified former judge may not be objected to for the first time on appeal.").

We overrule Mitchell's third issue.

---

[18]While recognizing that "precedent is against him," Mitchell states that he has presented this issue "to preserve [it] for review in the court of criminal appeals."

**D. Mitchell's Complaint That the Judgments Are Void**

In his fourth issue, Mitchell complains that the judgments are void because the decision that his sentences would run concurrently was made by the presiding judge who signed the written judgments, not the visiting judge who presided over his trial.

The State argues that if we vacate Mitchell's burglary conviction in our disposition of his first issue, Mitchell's fourth issue becomes moot. We agree. Because we have vacated Mitchell's burglary conviction, only the felony-murder conviction remains. Thus, there is no second sentence to run cumulatively or concurrently with the first sentence. Accordingly, we hold that Mitchell's fourth issue is moot.[19] *See Chacon v. State*, 745 S.W.2d 377, 378 (Tex. Crim. App. 1988) (holding that an "issue or proposition is or becomes moot when it does not, or ceases to, rest on any existing fact or right"); *Rachal v. State*, No. 02-18-00500-CR, 2019 WL 5996985, at *5 (Tex. App.—Fort Worth Nov. 14, 2019, pet. ref'd) (mem. op., not designated for publication) (agreeing with State that appellant's double-jeopardy complaint on

---

[19]Even if this issue was not moot, we do not find merit in it. Mitchell has pointed us to no case—and we have found none—standing for the proposition that the appropriate remedy is to void the judgments when an oral pronouncement of sentencing is silent on whether the sentences should be served concurrently or cumulatively while the written judgments require that they be served concurrently. Indeed, Mitchell acknowledges in his brief that the presiding judge's decision to order that his sentences run concurrently "[u]nquestionably . . . benefited" him. *Cf. Ette v. State*, 559 S.W.3d 511, 516 (Tex. Crim. App. 2018) (stating that a defendant's right to due process is violated when a court orally pronounces him to a certain sentence, and "then later, without notice to the defendant and without giving him an opportunity to be heard, [the court] enter[s] a written judgment imposing a *significantly harsher sentence*") (emphasis added).

33

appeal was mooted by court's vacating one of his convictions); *Stout v. State*, 908 S.W.2d 552, 553 (Tex. App.—Fort Worth 1995, no writ) (holding that appellant's complaint regarding issue of whether sentences should have run cumulatively or concurrently was rendered moot by the discharge of his sentences).

We overrule Mitchell's fourth issue.

## IV. CONCLUSION

Having sustained Mitchell's first issue, we reverse the trial court's judgment as to the burglary count and render a judgment of acquittal on that count. Having overruled his second, third, and fourth issues, we affirm the trial court's judgment as to the felony-murder count.

/s/ Dana Womack

Dana Womack
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: June 25, 2026